Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

SUCHA SAUDA LLC,                )
                                )
    Plaintiff,                  )
                                )
v.                              )
                                )
SELECTIVE INSURANCE             )      Case No.
COMPANY OF SOUTH CAROLINA,)   4:25-cv-01025-CDP
                                )
    Defendant.                  )
_____)


VIDEOCONFERENCE DEPOSITION OF

STEVEN J. WOHLSCHEID, PE, PMP

APPEARING REMOTELY

CLINTON COUNTY, MICHIGAN

MARCH 18, 2026, 1:02 P.M. CENTRAL TIME


REPORTED VIA VIDEOCONFERENCE
A. Christine Hylton, CSR, RPR


EXHIBIT

C

Page 34

verifica -- verification, outside of reviewing these reports regarding the weather events on the alleged date of loss?

A. Other than Mr. Schneider talking to the tenant, there was no other independent review.

Q. Okay. Really, I'm just trying to get at you're not going to provide any sort of weather analysis or meterol -- meteorological analysis regarding the alleged weather event on the date of loss, correct?

A. Not at this time. That's not planned.

Q. Okay. Not at this time.
Do you anticipate offering any testimony regarding that?

A. No.

Q. Okay. How did you determine that that specific weather event caused the damage to the roof?

A. So a number of weather reports were pulled, and there was a range of dates that were also pulled for the date of loss, and the data was reviewed to see was there any other weather events that were similar in size of the hail event that was on April 1st of 2024.
There were dates ranging from April of 2023 all the way till May of 2025, and the largest

Page 35

event was on April 1st of 2024.

Q. Okay. Was the -- was any sort of measure- ment taken regarding any findings on the roof, or any alleged dents?

A. So, again, there was measurements taken of the HVAC equipment, looking at the dents in the fins, and things like that.

Q. Can you say with a degree of engineering certainty that those happened on April 1st, 2024?

A. I can say that most likely those were caused on that date, given that it was the largest hail event in that time duration.

Q. Okay. Are you familiar with what the roof looked like prior to the date of loss?

A. I am not.

Q. Okay. This next bullet point, the subject property sustained damage to multiple building components, including but not limited to the flat roofing system, metal roofing components, and related building elements; is that correct? Am I reading that correctly?

A. Yes, you are.

Q. Okay. What damage to the flat roofing system did you identi -- identify?

A. So there was damage to the TPO roof.

Page 36

Q. Where?

A. As demonstrated in the report, in the pictures that are shown.

Q. That is based solely off the pictures regarding the chalk, showing the chalk?

A. The chalk, yes.

Q. Okay. Then the metal roofing components, I think we've kind of talked about that; but the same thing, you're -- you're basing that based off of the photographs that you reviewed?

A. Yes.

Q. Okay. Then related building elements, what does that mean?

A. Any type of trim, things of that nature.

Q. Anything else?

A. No.

Q. I'm sorry?

A. No.

Q. Okay. Okay. Then it looks like the next bullet point says due to the nature, extent and impact of the hail damage observed, full replacement of the affected roofing systems and related compon- ents is necessary in order to restore the property to its pre-loss condition and to apply with applicable building codes, manufacturer specifications and

Page 37

generally accepted industry standards.
Did I read that correctly?

A. Yes.

Q. Okay. Are you going to be offering testimony regarding the cost to replace the roof?

A. No. I would be testifying to what is damaged, not necessarily the cost.

Q. Okay. The extent of the damage that you would be testifying to is just what is captured in your photographs --

A. Yes.

Q. -- on your report?

A. Yes.

Q. Okay. Are you going to be offering testi- mony regarding what is necessary to restore the property to its pre-loss condition?

A. No.

Q. Okay. What manufacturer specifications did you review?

A. I did not review any for this property.

Q. Okay. Again, you've never physically been on this roof, correct?

A. Correct.

Q. Okay. Have you ever done any inspection on any roof in Missouri?

10 (Pages 34 - 37)

Page 6

Q. Okay. I'm scrolling down, so this states here, No. 1, that you will testify as an expert witness at the trial in this matter, correct?

A. Yes.

Q. Okay. It says that you are with Wohlscheid Civil Engineering PLLC; is that correct?

A. That's correct.

Q. Okay. When did you start Wohlscheid Civil Engineering or -- yeah, civil engineering; I'm sorry?

A. In 2018.

Q. Okay. Do you have any other engineers working under you?

A. No.

Q. It looks like here you're based in Louisiana?

A. That's where I have I'm a registered agent.

I'm actually based in Michigan.

Q. Okay. Just curious: Is there a reason why you are the registered agent in Louisiana?

A. I'm not sure.

It must be I have registry in Louisiana, for the State of Louisiana, so I was a little puzzled why it lists my address for Louisiana on this document.

Q. Oh, okay. So this would not be the address

Page 7

that you would ordinarily use for yourself?

A. No.

Q. Okay.

A. So some states require you to have an address in the state, and Louisiana is one of those; but I'm not sure. This case is not -- not in Louisiana, so I'm not sure why it would list that.

Q. Okay. Are you registered here in Missouri? Are you licensed here in Missouri?

A. Yes.

Q. Okay. When did you get your Missouri license?

A. I don't know that offhand.

Q. Okay. What were you asked to opine on as an expert in this case when you were retained?

A. To complete a foreign engineering investigation on the property.

Q. Okay. What is forensic engineering?

A. Forensic engineering is just an approach that's used to do an investigation or an evaluation on a -- on a property. It could be a building.

Really, it's to look at site observations, document what you find via photograph, mapping of damage, any patterns that are seen there; you know, look at what weather data is available,

Page 8

review pre-storm conditions, any type of records that the tenant or the owner may have.

Then I also normally correlate observed damage with ASCE 7, which is Minimum Design Loads and Associate Criteria For Buildings, so ASCE 7 is very common, commonly used to calculate what the environmental loads are anticipated in an area throughout the country.

Q. Okay. It looks like, are you reading something. It looked like you were looking at something just now.

A. No, no, I'm not.

Q. Okay. Prior to your deposition today, did you -- other than your attorney, did you speak with anybody about your deposition today?

A. No.

Q. Okay. Did you review any documents prior to your deposition today?

A. Yes.

Q. What did you review?

A. So I reviewed my report.

Q. Okay. Is that it?

A. Yes.

Q. Okay. Just whenever you were going through, what is inclusive of a forensic engineering

Page 9

investigation, you mentioned something about records the owner might have.

Did you review any records that the owner had for this property, in your investigation?

A. Yes.

Q. What records?

A. There was records, basic pictures that were taken before we did our site investigation, because when we got on site, the roof was actually covered up, so we were not able to see, ourselves, what the condition was of the roof.

Q. Okay. So you were not able to actually see the roof; there was a tarp covering it?

A. Well, a tarp or new covering.

It wasn't the material -- the material that was exposed on the date of loss was not -- was not -- you couldn't actually see that; it was covered up.

Q. Okay. So what portion of the roof were you able to actually see, whenever you completed your onsite evaluation?

A. So we were able to see the AC units. We were able to see -- you know, there was a -- a new covering over the top of the roof when we were there. You know, that's -- that's what we were able to see.

3 (Pages 6 - 9)

Page 10

Q. Okay. We just touched on it, but you prepared an expert report in this case, correct?

A. Yes.

Q. Does that report contain the full extent of the opinions that you intend to offer at trial in this matter?

A. Yes.

Q. Okay. Can I find all the bases and reasons for your opinions or conclusions you offer in your report within your report?

A. Yes.

Q. Does your report also contain any facts or any additional information outside of your conclusions that you relied on? Is all that information in your report?

A. Can you rephrase the question, please?

Q. Of course. Sorry; that was a bad question.

So any facts that you relied on, or that support your conclusions, anything that you will testify to is in your report?

A. Yes.

Q. Okay. Okay. It says here that you are expected to testify regarding the forensic engineering investigation of the insured property and your professional opinions concerning the scope -- the

Page 11

cause, scope, and extent of damages observed at the property.

Did I read that correctly?

A. Yes.

Q. Okay. What damages did you observe at the property?

A. There's a number of damages.

Let me pull up my report, and I can go through those, if you'd like.

Q. Well, we'll go through them later, so we can touch on that.

We're going to -- we're going to look at your report later, so if we need to reference the report more specifically, that's fine. I'll move on for now.

Okay. For your trial testimony in this case, you're charging your time at a rate of 250 per hour; is that correct?

A. Yes.

Q. Okay. What is your cost for travel expenses?

A. I guess, let's -- let's take a step back.

So your question was about trial?

Q. Trial or deposition testimony that you offer -- that you intend to offer, or your time today

Page 12

and for trial, are you charging at a rate of 250 per hour?

A. It would be 250 for the deposition.

If I'm actually required to attend for trial, that would be 400.

Q. Okay, 400 per hour?

A. Yes.

Q. Okay.

A. Then travel expenses would just be at cost.

Q. How much have you charged on this file to date?

A. I don't have that in front of me, so --

Q. Okay. I do believe that we had asked -- we had included in the Subpoena Duces Tecum, reference regarding your billing for this matter.

Will you provide that to us through your -- through NIA?

A. You have requested that --

Q. Yes.

A. -- I'm sorry?

Okay. If I'm requested, I will provide it, yes.

Q. Okay. Okay. It looks like it says on here that the physical inspection of the property was performed by a qualified building inspector acting

Page 13

under your responsible charge and supervision; is that correct?

A. Yes.

Q. What is the name of that individual?

A. Dave Schneider.

Q. Schneider?

A. Yes.

Q. Okay. Per the -- per the disclosure, again, he was operating under your responsible charge and supervision?

A. Yes.

Q. How do you define under responsible charge and supervision?

A. So the scope of his inspection, what he actually inspects, we -- we -- that's discussed prior to him completing that.

Obviously, you know, I'm -- I'm part of that, you know, obviously, that discussion before it happens, and direct him on what I want to see inspected.

Q. Okay. What did you -- what discussions did you have with him prior to his inspection?

A. Typically we'll talk about, you know, what -- what do we believe is the cause of the damage.

4 (Pages 10 - 13)

Page 14

We'll typically want to look at, you know, like an aerial view of the property, look at was it wind, was it hail, was it water damage. Then normally we pull a weather report, just to see what we -- what is the damage on the date of loss that's being reported.

Also, we base our -- our scope of our inspection is determined somewhat, or a lot, by what the materials are on the building itself.

Q. What did, specifically prior to him going to visit the property, what did you discuss with Mr. Schneider? What did you instruct him to do?

A. So we talked about, you know, that obviously, the address, the date of loss reported. We -- we talked about what the weather was on the date of loss, and we also talk about what would be anticipated as far as the damage based on the weather; and then we talk about, you know, what would be in the scope of the inspection.

Q. Okay. So you discussed what you anticipated you might see, prior to him actually inspecting the property?

A. Yes --

Q. Okay.

A. -- based on the weather that was document-

Page 15

ed.

Q. Okay. Based on the weather that was documented, okay.

So in terms of the anticipated damage, can you tell me a little bit more specifically about what you anticipated you would see prior to actually looking at the property? What did you discuss with Mr. Schneider?

A. So basically, when you get a certain hail size, you would anticipate if it's large hail, that you would have damage to HVAC units, you would have damage to trim pieces, flashing, for example.

Also, based on, you know, the material that's there, you know, depending on the size of hail, then you would -- you would look for damage on those elements, also.

Q. Okay. Then the scope of what he was going to look at, what did you instruct him, or what was he informed, in terms of where he was looking on the property?

A. So obviously we're focused on the roof, so the focus was to look at the roof itself, look for evidence of damage of the materials, look for damage of any mechanical equipment, any trim pieces, flashing, things of that nature; look for, you know,

Page 16

patterns that would align with the weather event.

Q. Okay. So is Mr. Schneider an employee of yours?

A. No, he's not.

Q. How did you find Mr. Schneider?

A. So I -- I do work in the Lansing area with a number of builders, and I have been involved with a lot of storm damage.

Basically my name was passed onto him via word of mouth as a recommended engineer, and Mr. Schneider and I have a -- an agreement, as far as performing these forensic studies.

Q. Okay. What is your agreement?

A. So the agreement is, he -- I work with him and direct him under my direct charge on doing the inspections; but he performs the inspections, you know, himself as part of that.

Q. Okay. Is he an engineer?

A. No, he's not.

Q. What licenses does he hold?

A. I do know that he's a general contractor in some states. I know that he is a -- he's done estimating before. He's been -- I believe he's been a public adjuster in the past, so he has a lot of experience in construction, a lot of experience with

Page 17

roofs, metal and shingle, and things like that.

Q. Okay, but would Mr. Schneider be able to apply engineering principles to determine the scope and the damage, cause of damage to the -- to this roof?

MR. BARNARD: (Inaudible)

THE COURT REPORTER: Erik, did you say something?

MR. BARNARD: Yeah, I said form.

I'm sorry if I'm not loud enough.

MS. MERZ: You can answer.

THE WITNESS: Yeah, so Mr. Schneider is performing the inspection and capturing the photographs; so I wouldn't expect him to apply engineering judgment or any type of engineering responsibility as relates to these forensic engineering reports.

BY MS. MERZ:

Q. Okay. Was he compensated for his time?

A. To my knowledge, yes.

I didn't compensate him directly.

Q. Okay. How was he compensated?

A. I believe with Plaintiff's attorney.

Q. Okay, and who -- who did you say passed -- someone passed your name on to him?

A. It was a general contractor in Michigan --

5 (Pages 14 - 17)

Page 18

Q. Okay.

A. -- since Mr. Schneider is from Michigan.

Q. Does Mr. Schneider, does he live in Missouri?

A. No, he lives in Michigan.

Q. Okay, he lives in Michigan presently, okay.

A. Yes.

Q. Were any other onsite inspections completed by you or Mr. Schneider?

A. No.

Q. Okay. I believe you said Mr. Schneider actually was not even able to see the roof when he got up there; is that correct?

A. Well, he saw the roof, but it had a covering on it --

Q. Okay, so was --

A. -- when he observed the site.

Q. That's fair.

So he was not able to see the roof surfacing?

A. Not the same roof surfacing that was present on the date of loss.

MS. MERZ: Okay. I'm going to stop Share for just a second.

I'm showing you what is marked as Exhibit

Page 19

2. This is a long file, so we'll scroll slowly.

This is one of the hardships of Zoom, I think.

(Exhibit 2 marked.)

BY MS. MERZ:

Q. Okay. So you had provided some documentation to -- I believe through NIA to us regarding your file.

Did you provide your file to us yesterday?

A. I thought it was Monday; it wasn't yesterday.

Q. Okay. That's fine.

So within this week, you provided your full file?

A. Yes.

Q. Okay. I'm going to just scroll, and we'll just take a minute. I'm going to go slowly, so that you can see it.

This is going to take us a few minutes, because it's -- I think it's 500 pages.

Tell me to slow down if I need to. I'm going to just kind of scroll.

A. Can you -- can you pause, go back up?

Q. Sure.

Page 20

A. I just want to check the date that's on the report here.

Q. This is --

A. Okay, this is --

Q. -- (inaudible) report, yes.

THE COURT REPORTER: This is --

THE WITNESS: Okay.

THE COURT REPORTER: Wait. This is what?

MS. MERZ: I'm sorry.

This is Global's report.

I'm just going to do this. I think -- I think we got backed up.

Okay. Does this appear to be your entire file?

A. Yes.

Q. Is everything that you relied upon in forming your opinions and preparing your report contained in this file?

A. Yes.

Q. Okay. I am going to stop Share for a second.

Okay. We're back on the disclosure. Okay, and it says here that you reviewed, evaluated and relied upon the inspection findings, photographs, measurements, and documentation generated during that

Page 21

inspection, together with your review of historical, meterol -- metrological data, applicable building codes, industry standards, and the application of accepted engineering principles and methodology in forming your opinions.

Did I read that correctly?

A. Yes.

Q. What inspection findings did you review, evaluate and rely upon?

A. There's a -- a list of -- there's photographs that are in my report that I relied upon, also testimony from the tenant from the property.

Q. Okay. The photographs that are contained in the report, who were those taken by?

A. Those were provided by basically the -- the Plaintiff's attorney.

Q. They were taken by the Plaintiff's attorney; okay.

A. Well, they were provided by the Plaintiff's attorney.

Q. Okay. Do you know who took them?

A. I do not.

Q. Do you know when they were taken?

A. They were taken obviously after the -- the date of loss, is my understanding. They were taken

6 (Pages 18 - 21)

Page 22

in 2025.

Q. All of the photos were taken in 2025?

A. All the -- all the photos in my report were, yes.

Q. Do you know that for certain?

A. Yes.

Q. How do you know that?

A. Because we were provided the photos, and we were told that they were from 2025, after the date of loss.

Q. When was the date of loss?

A. The date of loss is April 1st of 2025.

Q. Are you aware that the Plaintiff has reported the date of loss as April 1st, 2024?

A. Now that I have looked at the report, it looks like we had the date wrong on the cover.

It should have been the 2024 date, and all of our weather data aligns with that, so I'm not sure how that date was misplaced.

Q. Okay. So are you sure that the photos were taken in 2025?

A. I believe they were taken in 2024.

Q. Okay, but you don't know which date --

A. No, I --

Q. -- when they were taken?

Page 23

A. No, I don't.

Q. Okay. So I know you had said there's some photographs in your -- in your report.

What specific inspection findings did you rely upon, review, evaluate and reply upon?

A. So just looking at the TPO roof, there's a number of -- of impact marks that you can see, by basically we use chalk to highlight where those dents are at, so we have a number of dents actually in the -- the material below the actual TPO material. That's shown by when you put the chalk across there, you can see where there's a dent actually in the -- in the board underneath.

In addition, there's a lot of mechanical damage on the AC units throughout.

Q. Did you apply the chalk?

A. No, I did not.

Q. Did Mr. Schneider apply the chalk?

A. No.

Q. Okay. Do you know who applied the chalk?

A. No, I do not.

Q. So in the photos, are you -- you're actually not even able to -- to specifically testify whether the closeup photos are the roof that is on this property, correct?

Page 24

MR. BARNARD: Form.

THE WITNESS: No, I can -- I can tell there's obvious -- you can see the same mechanical equipment on top of the roof, and the same surrounding buildings.

BY MS. MERZ:

Q. Okay. Is the application of chalk to what is allegedly hail damage, or what you would maybe consider hail damage, how would you -- how, as an engineer, is that a standard engineering practice to identify hail damage?

MR. BARNARD: (Inaudible)

THE COURT REPORTER: Erik, I can't hear you.

MR. BARNARD: Sorry, form.

THE COURT REPORTER: Thank you.

MR. BARNARD: Sorry. I'll say it louder.

THE WITNESS: Yeah. So basically you take a piece of chalk, and you go over the surface; and the chalk, where it doesn't fill in, it shows you where there's a dent in the material itself.

BY MS. MERZ:

Q. Sure. No, I understand that.

Is that a standard engineering practice to identify hail damage?

Page 25

A. It is to identify where hail damage could be.

Q. Okay. Where would I find that, or how did you learn of that practice, or where would I find that reference in any engineering materials?

A. I know that's in the HAAG Institute, they -- they reference -- I believe they reference that.

I wouldn't be able to tell the exact where in HAAG Institute, but I know that's a common approach used by engineers and technicians to find where there is damage. It's used in soft metals, any type of roof where there is a dent. Basically you're trying to highlight where there's a dent in material.

Q. Okay. Have you specifically utilized this chalk method when examining roofs yourself?

A. Yes.

Q. Okay. All the photos that are in the file, does that include all the files that you produced or that you relied upon in making your report?

A. Yes.

Q. Okay. It looks like there was also maybe some photos provided by NIA in 2026; however, those would not have been -- your report was dated September, I believe 10th or 11th of 2025, so those would

7 (Pages 22 - 25)

Page 30

A. As quoted in the report, I did reference a number of ASTM standards that are utilized when you do a forensic report.

Q. Okay. What does ASTM stand for?

A. It's funny you should ask that.

I don't -- I don't recall.

I could look it up.

Q. That's okay. I was just curious, because I don't know off the top of my head, either.

Okay. Then what accepted engineering principles and methodol -- methodologies did you rely upon in forming your opinions?

A. I kind of went over these before, but basically site observation, looking at weather data, looking at what are the typical design loads for a building; for example, in Missouri, looking at what would be, you know, basically the loading that you would see in that area from those same wind pressures or wind speeds; so that's part of it.

Also just looking at what type of roof structure is up there, what type of components and cladding, and then looking at what was the weather event on the reported date of loss; then does the damage that we see, does that align with that weather event from what was reported.

Page 31

Obviously you spend a lot of time and attention, you know, looking at the roof sections that are most exposed to the highest wind pressures, and looking at what is the most exposed, as far as hail, for example, on this property.

Q. What -- what would be the roof sections most exposed to the highest wind pressures?

A. So typically it would be like the trailing edges of the building are the most exposed. Usually they have the most uplift or pressure gradient, versus in the center of the roof.

On a flat roof, most likely would be, you know, like the parapet walls or the edges. Then once you get past those, you know, they would shield the wind and the hail; but then once you get more towards the center of a flat roof.

Q. Okay. You mentioned looking at the roof structure and cladding; is that what you said?

A. Yes.

Q. Okay. Can you tell me about this partic-ular roof structure --

Well, first off, actually, scratch that.

Let me ask, what is cladding?

A. Cladding is typically what's used to, you know, cover up the roof; or it could be, you know,

Page 32

what's -- like on this structure, you have the parapet wall that goes around the perimeter of the building; so typically it's flashing, things like that.

Q. Okay. Okay. Then it looks like a little bit further down it says based upon that investigation -- which by that investigation that means the investigation completed by Mr. Schneider, correct?

A. So, again, Mr. Schneider took the photos.

I was in charge of the overall investigation.

Q. Okay. Based upon that -- So I thought you had previously said that you did not know who took the photos, that you received the photos from Plaintiff's counsel, and that you did not know who took them?

A. That is correct.

Just in general, Mr. Schneider's role is to take the photos.

The photos in the report, he did not take.

Q. Okay. So he did not take these photos?

A. No.

Q. Okay. Okay. So it says based upon that

Page 33

investigation, Mr. Wohlscheid is expected to testify that: A severe hail event occurring on or about April 1st, 2024, and was the proximate cause of damages observed at the property; is that correct?

A. That's correct.

Q. Do you have any training or experience in meteorology?

A. No, I do not.

Q. Okay. What reports did you rely on regard-ing the weather data?

A. Multiple reports.

Q. Are all of those --

A. I list them.

Q. -- are all of those contained in your report?

A. Yes.

Q. Okay. How did you decide which sources to review regarding the weather data?

A. You generally pull in multiple sources, so as -- as shown in the report, there's multiple sources listed, and then we just look at what does the aggregate of that show.

Typically, we try to get as close to the address of the property as we can.

Q. Okay. Did you do any independent

9 (Pages 30 - 33)

Page 46

Q. Okay. Scrolling down, all right -- we talked about this already, but it says Date of loss: April 1st, 2025.

Do you believe was that a typo?

A. Yeah, that's a typo.

It should have been 2024, as we talked about.

Q. Okay.

A. I'm surprised that we missed that.

Q. Okay. Then on page 2 of your report it says -- let me scroll. Our pictures keep getting caught on my screen, to then where I can't read what's on my screen.

This first bullet point says onsite walk-through consisting -- I'm sorry. Let me back up.

This report is based on the following: Onsite walk-through consisting of visual observations, instrument assist non-invasive evaluation, and photo documentation of the current damages and condition -- conditions present at the above-mentioned property; is that correct?

A. That's correct.

Q. Okay. It looks like, in terms of visual observations -- I think I know what that means, but could you just tell me what -- could you just tell me

Page 47

what you meant by that, in this report?

A. Yeah. So basically we looked for any of the building components, to look for damage that would align with the environmental conditions on the date of loss.

Q. Okay. So you were going into this report with the idea that there was hail damage, and you're just looking for the hail damage based off the fact -- based off the weather data you reported?

A. We -- we didn't assume that there for sure was hail damage, but it's very possible, given the size of hail on the date of loss, that there was damage.

Q. Okay. Then instrument assisted noninvasive evaluation, what does that mean?

A. So typically I ask the team to -- a lot of times we have like a slope measuring device.

Obviously, this is a flat roof, so that would not be applicable.

Sometimes we have a gauge that would measure the thickness of, for example, on shingles. Obviously that's not applicable to this property.

Then sometimes we have a moisture meter that we use, and that was not used on this property, either; so that's what's typically referred to when

Page 48

we say that.

Q. Okay. So there were no instruments -- instrument-assisted noninvasive evaluation completed on this property?

A. Correct.

Q. Okay. Why wasn't a moisture meter used?

A. Again, when we got out there, the -- the roof was covered up already, so I don't know that it would work very well.

Q. Okay. Photo documentation of the current damages and conditions present at the property, I know we've talked extensively that the photos were what you relied upon in preparing or assessing the damage.

In terms of current damages, the photos do not capture damages on September 10th, 2025, correct?

A. They -- they do, of the interior of the building.

Q. So the pictures that were taken of the interior that are in your report, those were taken on September 10th, 2025?

A. Yes.

Q. Okay. So I thought you had previously said that none of the photos were taken by Mr. Schneider?

Page 49

A. Well, I was referring to the ones on the roof.

Q. Okay. So the interior photos were taken by Mr. Schneider?

A. Yes.

Q. Okay. So any photos regarding the roof or any attachments to the roof, those are -- were not taken on September 10th, 2025?

A. Correct.

Q. Okay. So they would not evidence current damages, as quoted in your report?

A. Correct.

Q. Okay. I think on page 5 is where it references when -- yeah. So the field walk-through of the subject -- subject property was performed on September 10th, 2025.

Where in your report does it reference that Mr. Schneider was the one who completed the inspection of your -- of the property?

A. I don't believe it says that in there --

Q. Okay.

A. -- of who did that.

Q. Then I know you said that you reviewed sections of the IBC, IEBC, and IRC, correct?

A. Correct.

13 (Pages 46 - 49)

Page 54

with that April 1st date.

Q. Okay. Whenever you say what we're seeing with regard to damages, you are -- my understanding, and correct me if I'm mistaken, is what you're seeing on the HVAC units?

A. The HVAC units, and then obviously we were getting those photos from Plaintiff's counsel.

Q. Okay. The photos, how are you able to tell the size of the measurement of whatever is identified by the chalk?

A. There's -- there's no direct correlation as far as that.

Obviously we don't have a tape measure in those photos, so it's just approximate, based on, you know, looking at the -- the size of other things in the picture.

Q. Again, you don't know when those photos were taken, correct, of the roof surfacing?

A. As I said before, we were told that it was after the date of loss; but again, I don't know the exact date.

Q. Okay. The alleged date of loss was April 1st, 2024, and -- and your report is from September 29th, I believe, 2025, correct?

A. Correct.

Page 55

Q. Okay. It looks like on page 5 it says the observations of damages described below are not to be construed as a condition survey of the subject property.

What do you mean by that?

A. Yeah. Basically what I mean by that is we're not taking things apart, right? We're not looking like at the electrical, for example. You know, we're not providing a complete review of the entire building itself.

So there could be other damages; for example, the sheeting of the roof, electric -- electrical components, any type of mechanical that's not obvious.

This isn't to be construed as -- as a total condition survey of the whole property; that's what that's referring to.

Q. Okay. Further down -- sorry, one second -- it says circular shaped impacts, consistent with the size of hail reported on the date of loss, were noted on the subject roof covering.

Did I read that correctly?

A. Yes.

Q. Noted by who?

A. As noted by the pictures that we looked at.

Page 56

Q. Okay. So the pictures that were taken by we don't know who?

A. Correct.

Q. Then where it says consistent with the size of hail reported on the date of loss, I believe you just testified that there's no measuring tape or any other observation in the photos, something to capture the measurement of any sort of dents, or anything that would be on the roof surfacing; is that correct?

A. Yeah, other than, you know, typically a four-inch piece of chalk is used, and you can look at, you know, the -- the overall dimension of the chalk that was used on the roof, and you could -- you could scale that to some extent. That would be the only thing I could point to.

Q. Okay. Is that an opinion based off a degree of engineering certainty, a reasonable degree of engineering certainty?

A. I'll have to say no.

I mean, most -- most of the time, the chalk is around four inches.

I can't say for certain that this chalk is, indeed, four inches long, but that's typical.

Q. Okay. So whenever you're talking about the piece of chalk, you're just talking -- you're talking

Page 57

about in general, pieces of chalk are four inches?

A. Yes.

Q. Okay. It also says one section of cap flashing had become dislodged due to the storm, correct?

A. Correct.

Q. Is that -- was that seen on the day of the inspection, or is that captured in one of the photographs that was previously taken?

A. It's my understanding that that was something that -- that Dave saw when he was there; but he didn't capture a photo, that I'm aware.

Q. Okay. How do you know that he saw that?

A. Because we had a conversation about it.

Q. Okay. Is that conversation in writing?

A. No.

Q. Was it by telephone?

A. Yeah, we did talk about it. I don't recall when, so --

Q. Okay, and --

A. (Inaudible) the report.

Q. I'm sorry. What did you say?

A. It was obviously prior to the report, but I don't -- I don't recall the exact day we talked about it.

15 (Pages 54 - 57)

Page 70

Mr. Schneider told you he took those?

A. Yes.

Q. Okay. Okay. The roof pictures, you don't know who took these photos?

A. Correct.

Q. Okay, or the exact date that they were taken?

A. That's correct.

Q. Okay. What -- in reviewing this photo, what -- what did you identify in this photo, or did you rely on anything in this first picture on the roof in determining your damages -- your assessment of damages?

A. So this first photo just shows an overall number of locations that have hail impact, so that's the purpose of that, just to give you an overall view for a smaller section that was inspected, to see how many impact marks there are.

Q. Okay. Then what about photo 2 --

A. Yeah, 2 is --

Q. -- that are we looking at?

A. Yeah, 2 is you're just getting -- again, I don't know who took these, but No. 2 would be normally you get a little closer look to see how the size, approximate size of the hail impact; so this is

Page 71

just giving a closer up view of the same area that's in picture 1.

Q. Okay. When looking at these pictures, what principles or methodology did you use to determine with a reasonable degree of engineering certainty that these were identifying hail damage?

A. So overall, the first picture, normally you do like a ten-foot by ten-foot area, and then you go through and see how many hail impacts we have.

Then looking at each hail impact, then you generally use a piece of chalk, go across, and you see is there a dent in the ISO board that's typically below the TPO roof. Then when you strike the piece of chalk across, then you get an idea of how large the indent is, and then does that align with the hail impact mark.

Also, when looking at the number of impact marks you're looking at, you have a scatter. You wouldn't want to see a pattern of foot traffic, somebody dragging something.

In St. Louis, there's a lot of -- you'll find bullet holes, where bullets are fired in the air and land on the roof; so you look for that. Obviously, you exclude that.

So you look for something that would be

Page 72

more likely a hail -- hail pattern, you know, not -- not a picture from something being dragged, not foot marks, things of that nature, not bullet holes, you're looking for a pattern that would be similar to what we would see with hail.

Q. Okay. So looking at these specific photos, what methodology did you use, or what -- what determination led you to conclude that this was hail damage, just looking at these pictures?

A. Basically the pattern of the impact marks, and then overall, the -- the shape of the mark itself, and then the size.

Q. Okay. How are you able to identify -- I think you had just said before, and so correct me if I'm -- if I'm adding something that you did not actually consider dents to the ISO board.

How, from these photos, were you able to conclude that there was a dent to the ISO board, if you did make that conclusion?

A. So when you -- you strike the chalk across the top of the surface, and chalk is not -- is not deposited on the material, then there has to be an area where the surface is lower than the rest of the surface, meaning that there's some sort of dent in the material, on the TPO itself.

Page 73

It is likely you're not going to dent the TPO, so it would be the board that's below it.

Q. Okay, so -- I don't know. So like looking at this picture, how do you know that somebody just, for example, didn't take their finger and stick it on a spot of the chalk? Like how can you tell that that is a dent?

A. Just -- just by looking at it overall, it doesn't appear to be the shape of a fingertip; it's -- it's more random than that. It appears to be from hail.

I guess I'd be surprised if somebody was walking around marking chalk, and then erasing the chalk with their finger.

Q. Okay. Can you see my -- my scroll -- my pointer on here? Are you able to see that, or can you just see my screen (indicating)?

A. I can see your pointer.

Q. Okay. Where in this photo do you see a dent, or a supposed dent, in that chalk line?

A. Yes, I do.

Q. Where?

A. So if you double-click on the picture, it should open up.

Q. Oh. Let's see if it will let me do this,

19 (Pages 70 - 73)

Page 74

okay.

A. You may have to drag the -- the pop-up to your screen.

Q. Oh, here. Let me just do this, because it's showing me the same picture, so I can probably just zoom.

Okay. Can you see that better?

A. Yeah. So you can see the area about two-thirds from the left towards the bottom, there's a spot there where you don't have chalk deposited.

Q. Okay. Okay. So did you make that -- did you utilize that same methodology and analysis regarding whether there was the chalk had a space where the chalk was not present from this line? Would that be the methodology that you used in considering all of these photos, to assess whether there was hail damage to the roof surfacing?

A. Correct.

Q. Okay. Are there any other components of this roof -- of these photos that you believe identified hail damage?

A. Can you rephrase the question?

Q. Yeah, sorry. That was a bad question.

Are there any -- is there anything else that you can identify, or any other parts of these

Page 75

photos that led you to the conclusion that hail damage caused damage to the roof surfacing?

A. I'm not sure I understand that question; but if you look at the rest of the pictures, a similar pattern is present on those pictures.

If you're asking -- if you're asking if there was only one spot; no, it was multiple spots in multiple pictures.

Q. Okay. I'm just -- I'm just curious if there was any other -- any other identified hail damage, other than in these spots with the blue circles that you identified of hail damage?

A. Obviously, we already talked about the HVAC, but those -- those spots are hail damage.

Q. Okay. Whenever you're talking about the HVAC unit photos, are you talking about like this photo in No. 10?

A. No. I would refer to photo No. 4 on page 34, page 34 of 39 of the report.

Q. Okay. Okay. So these photos?

A. Scroll down to No. 4.

Q. No. 4?

A. Yes.

Q. Okay. These are the AC fins --

A. Yes.

Page 76

Q. -- the condenser fins? Okay.

A. And No. 5.

Q. Okay. What, specifically, is considered hail damage here?

A. So any of those marks that you see on the fins themselves.

Q. Okay. Were these photos taken by Mr. Schneider?

A. No, they were not.

Q. Okay. So were just the interior photos taken by Mr. Schneider?

Sorry. I feel like we've gone back and forth on this; and I'm not trying --

A. No, no, no. I said that he took the exterior photos of the building and the interior photos, but not the photos that are on top of the roof.

Q. Okay. So he did not take these pictures, either?

A. That's correct.

Q. Okay. I'm sorry. I'm not trying to confuse you, or testify for you regarding that; I just am forgetting what you said.

Okay. So he did not take any pictures regarding the roof?

Page 77

A. Correct.

Q. Okay. So these interior pictures were taken by Mr. Schneider?

A. Yes.

Q. Okay. These were taken on September 10th, 2025?

A. Yes.

Q. Okay. Again, any opinions that you intend to offer in this case are encompassed in this report, correct?

A. Yeah. I guess, let's back up; my apologies.

So when I said -- He did actually take some of these photos; so picture 14, 15, and 16, he did take, because you can tell that the new material is there. You can tell the differences in the roof.

Q. So you -- Do you know that those were taken because the tarping was down, or you know those were taken because you were looking somewhere else?

A. The tarping was down.

Q. Okay. Are you aware --

A. It's my --

Go ahead.

Q. No, I'm sorry. You go ahead.

A. So it's my understanding, when he got

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

Page 78

there, he was not able to see the roof -- roofing material the date of loss. In his pictures, he was not able to see the marks, so that's why I relied on others; but these photos actually do show the roof material that is down, so I would -- my assumption is that he did take these: 14, 15, and 16, but not the others where the material is missing.

Q. Okay. So you're assuming that he took them; you don't know that for certain?

A. I would have to agree with that; I guess I don't know for certain.

I'm just basing that based on what material is on the roof and my understanding of what it was when he went there.

Q. Okay.

A. I'd have to -- I'd have to ask him.

Q. Okay. Okay. So all of your opinions are contained in this report; I think you've already answered yes, correct?

A. Correct.

Q. Okay. I'll stop Share.

This was a TPO roof, correct?

A. Correct.

Q. What does TPO stand for?

A. That's spelled out in the report.

Page 79

I don't have the material memorized.

I can look it up for you really quick.

Q. Nope, that's okay.

Can you tell me how a TPO roof is constructed?

A. Generally, the -- the material is laid down. Normally there's -- at any of the seams, they're like welded together, is my understanding. Generally there's some type of fiber board underneath it.

Q. Okay. Do you know the material that those items -- that those are made out of, those layers?

A. Well, I talked about that in the report, the exact material.

Q. Okay. So it's in your report?

A. Correct.

Q. Okay. What is the thickness of a TPO roof?

A. It varies; but again, this is the thermo-plastic polyolefin roof, and it varies in thickness, but some are as much as 60 mil or greater.

Q. Okay. How many layers were on this roof?

A. Yeah. My understanding, I thought there was just one.

Normally there would be a foam insulation board below that.

Page 80

Q. Okay. So do you know that there was not one on this roof?

A. I do know that there was a board underneath it.

Q. Okay. So there's a board, and then there's the roof surfacing or --

A. Yeah, there's a -- there's basically an insulation-type board, and then there's the TPO on top of that.

Q. Okay. Those were the only two layers on this roof?

A. Just a second.

Yeah, that's my understanding, that they were just single-ply thermoplastic polyolefin with that board that was underneath.

Q. Okay. Are you looking at your report right now?

A. Yes.

Q. Okay. Did you take any core samples of the roof?

A. We did not.

Q. Why not?

A. At the time when we went out there, it was covered up, so it didn't seem like cutting, you know, that material that was there protecting the roof made

Page 81

sense.

Q. Did you ask anybody to cut back any portion of the covering on the roof so that Mr. Schneider could see it?

A. No.

Q. Okay. How come?

A. Again, it was a lot of new material that was covering it up.

You know, based on the size of the hail, the extent of leaks inside the building, and the pictures provided, we thought we had enough information to write the report without cutting it back or taking core samples.

Q. Okay. What are the benefits of a TPO roof?

MR. BARNARD: Form.

THE WITNESS: Typically, they're good at -- they have a long design life, typically.

BY MS. MERZ:

Q. Do you know what the typical lifespan of a TPO roof is?

A. I thought it could be up to 20, 30 years, probably more towards the 30-year mark.

Q. Okay. Do you know what the -- you know, what impact the lifespan of a TPO roof is?

A. Obviously, where you do have welds, you

21 (Pages 78 - 81)

Page 82

want to make sure the welds are good.  If you have any penetrations, you want to make sure that those are sealed up well, and that you maintain those seals.

You don't want a lot of -- if you have foot traffic, you want to make sure that you're not damaging the roof.  Especially if there's equipment up there, you want to be careful how it's moved.

Q.  Would you say that maintenance can impact the lifespan of a roof?

A.  If they're not -- if they're not taking proper precautions, yes.

Q.  What type of maintenance is recommended for a TPO roof?

A.  My understanding is you want to make sure that you don't have any ponding water.  You also want to make sure that if there is any penetrations, that you maintain those seals.

Q.  Where -- what information, or where -- What is that understanding based off of?

A.  Well obviously, if you have penetrations, and you don't maintain the -- the seals around there, then you can get leaks; so I mean, that's just pretty straightforward.

Then if you have standing water, and you

Page 83

just let that sit, and then you have that in combin-ation, if you have seals in the area, it would be more likely to get leaks in those areas; so obviously it's just better to limit that standing water, and you want to make sure that those seals are proper.  I mean, the biggest concern is around the seals.

Q.  Would you recommend to an owner that they periodically check the roof for holes or defects?

A.  Yes.

Q.  Do you know if that was done in this case?

A.  I'm not aware of their maintenance history.

Q.  What type of wear and tear would you tell an owner to look out for, when doing periodic roof inspections of a TPO roof?

A.  So again, I would focus on any of the areas that are sealed, for any penetrations.

I would want to look for any type of equipment up there that may be blowing around in the wind.

I'd want to make sure if there's any drains, that the drains are clear; that way, there's not ponding water.

I would want to make sure, if there is any maintenance personnel up there, that they're taking proper precautions not to damage the roof.

Page 84

Q.  How would you differentiate wear and tear versus hail damage to a roof?

A.  I would say what I -- what I have seen for wear and tear is if maintenance goes up there in the very heat of the day, and they're wearing, for example, boots that may have rocks or something in the tread, you know, that can damage the TPO roof.

As far as the seals, if the seals aren't maintained, they can crack over time, and then let water in them; so those are the main things.

Then just making sure that drains are clear, and that water is flowing.

Q.  Did you or Mr. Schneider examine the seals on this roof?

A.  So, again, when we were there, it was covered up; then the pictures we did -- we did take a look at -- you know, the focus was on the -- the impact marks on the material itself, not the seals.

Q.  So you would not be able to say whether there was maybe the source of some of the water intrusion, or what you were seeing on the interior could have been attributed to seals, because you didn't see photos of it?

A.  The -- the large extent of water leaks, I don't believe there was that many penetrations, but

Page 85

I can't say for certain that water is not coming through a seal.

Q.  On the watermarks, or on the marks that you -- you said you relied on, based off the photos on the roof, were any of them holes?  Did you identify any holes in the roof surfacing from those photographs?

A.  When we looked at the photos, there -- there -- we didn't look at them through -- we didn't take samples or anything, so I don't know for certain if there were leaks in those impact marks or not; and we only have -- we only have the pictures that we looked at, so I don't know if there was holes there or not.

Q.  Okay.  So you don't know what the source of the -- of the water intrusion on the inside of the property, you don't know what that's from, correct?

A.  Well, the understanding was it was based on the date of loss from the hail impact, based on the discussions with the tenant and the number of hail impacts in a very small area.

Q.  The understanding, was that based off your engineering report -- your engineering review of the property, or what is that understanding from?  What methodology was -- was used to make that conclusion

22 (Pages 82 - 85)

Page 90

things.

Q. Okay. So they're not all related to hail or weather-related damage?

A. No, some -- some are could be tree impact. Obviously it's weather, but it varies.

Q. Okay.

A. I'm also involved with -- I do a lot of concrete and steel design.

I do have my Master's from the University of Michigan in structural design, so I do do some of that, also.

Q. How many cases or files have you worked on that involved hail damage?

A. Maybe around 75, if I had to guess.

Q. Okay. You provided some cases down here regarding deposition testimony that you've offered in the last six years.

What percentage of your -- I'm not holding you to an exact percentage; but on average, what percentage of your services are engaged with plaintiffs, versus defendants?

A. It's probably 95 percent plaintiffs.

Then, yeah, I guess I'm trying to think; so when I work for a homeowner, and I'm coming up with repairs to their house, I would assume that

Page 91

would be -- I don't know what that would be.

Is that the defendant?

Q. Well, so that's a fair question.

In cases where they're actively involved in litigation.

A. Okay. I'd say majority are, maybe 95 percent are with the plaintiff.

Q. Okay.

A. These other ones are not cases; I'm just working for the insurance company or the builder, so that they can get a building permit.

Q. Got it. Okay. I understand that. That makes sense.

Okay. Who trained you on how to do roof inspections?

A. Again, I took a HAAG certification course about doing inspections.

More so, it's about the report itself, how to -- how to do the report.

As far as the inspection, you know, I've done over 200 reports; and again, I got my certification through the HAAG --

Q. When did you get that?

A. -- Institute.

Q. Oh, I'm sorry.

Page 92

A. I believe it was 2023.

Yeah, it was July 20th of 2023.

Q. Okay. As a general matter, what criteria do you use to determine whether there was hail damage to a roof?

A. The general criteria is basically just look for -- it really depends on the material; so you've got to account for what material type you're looking at, to determine if there is hail damage.

So if you have, you know, a shingle roof, versus like a tile roof, or if you have a flat roof with a TPO, it all depends on, you know, what you're looking at. A metal roof is different, so it all varies, based on the material you're looking at, and then what is -- what is the actual damage that would cause functional versus cosmetic.

Q. Okay. What about a TPO roof specifically? What criteria do you use to determine whether there was hail damage to a TPO roof?

A. Yeah, generally you're looking for is -- is there damage to the TPO material itself; is the -- the insulation below that, is that impacted? But typically, you're looking at is there any type of damage to the roof, where now the strength would be limited. That's where it is best to take those core

Page 93

samples, and then do the testing.

Q. How often do you opine or provide opinions on damage to roofs?

A. So I have -- like I said, I've done a number of reports, and typically work on, the last few years, at least 40, you know, 40 reports a year, so pretty frequently.

Q. Are all of the 200 reports related to roofs?

A. Not -- not all are.

I have had some jobs where it could be a retaining wall, for example. It could be impact, wind impact on -- I've had a few jobs with hurricanes, with wind impact on like lanais, for example.

We've had racking of building, where it damaged the walls, things like that.

Q. Okay.

A. It's not always roofs.

Q. How many of the reports of the 200 would you say are opinions on damage to roofs?

A. Probably 75 percent, at least.

Q. What percentage of that are damage to a TPO roof?

A. Probably 15 percent.

24 (Pages 90 - 93)

Page 114

Q. Understood. That's ASTM Standard E2713-18, E1188-11, E3176-20, E620-18?

A. That's correct.

Q. Okay. Did you --

A. So, for example, E3176, that's the standard guide for forensic engineering for expert reports.

It talks about the -- the overall report content. It talks about the purpose of the report, talks about how the overall formatting of that, and -- and what should be used as the content, and kind of capture that material.

Q. Understood.

Okay. Then you also have followed the standards set out by the ASCE; is that correct?

A. Yes, ASCE 7.

Q. Okay. Are these ASTM and ASCE standards widely accepted and used by forensic engineers to assess stress -- to assess structural damage?

A. Yes.

Q. Okay. How about determining the cause and origin of damages when doing a forensic evaluation? Are those standards also followed?

A. Yes, they're -- they're common standards, and they are followed, to determine what is the cause of damage as documented.

Page 115

Q. Were you able to reach a conclusion as to which weather event caused damage to this property that we're here to discuss?

A. Yes. It was the April 1st of 2024, based on the weather data, the eyewitness testimony from the tenant, and the damage that was witnessed, both in person and through review of photographs.

Q. Okay. Were you able to ascertain the approximate size of hail that impacted this property on or about the date of loss that you just mentioned?

MS. MERZ: Objection, form, speculation.

MR. BARNARD: Did you understand the question?

THE WITNESS: Yes.

The hail size varied, but it was approximately one -- one-and-a-quarter to one-and-a-half inches.

BY MR. BARNARD:

Q. Okay. Was that information obtained through the weather data you collected?

A. Yes.

Q. Okay. Was that weather data that you collected about the size of the hail, did that corroborate with the other data you collected through the photographs showing the impact marks to this

Page 116

roof?

MS. MERZ: Objection, speculation, form.

THE WITNESS: Yes. Based on the pictures that we reviewed with the chalk marks and the damage on the roof, it did align with that size, which went all the way up to two inches, per the -- the NOAA report.

Q. Got you.

All right. I think we talked about this a lot, but you inspected the TP -- I'm sorry.

Part of your inspection involved an inspection of the TPO roof, correct?

A. Through -- through photographs, yes.

Q. Okay. What did you observe through those photographs regarding the condition of the TPO roof, as indicated by the photographs you reviewed?

A. So based on a sample area, there was extensive impact marks on the TPO roof itself.

Q. Okay. Were those impact marks consistent with some sort of originating force?

MS. MERZ: Objection, speculation and form.

THE WITNESS: Yes, the impact marks were, you know, based on a sample area, align with what would be anticipated for the size of hail as

Page 117

documented on the date of loss in the weather data.

Q. Got you.

All right. As part of your -- your investigation of this claim, did you have an opportunity to inspect or have someone inspect the interior of the property, to observe any sort of damages?

A. Yes, Mr. Dave Schneider inspected the interior of the building.

Q. Were any damages found to the interior?

A. Yes, significant damage was found, as documented in the pictures in the report.

Q. Okay. All right. Are the opinions and conclusion presented in your report formulated to within a reasonable degree of engineering certainty?

A. Yes.

Q. Okay. Based on your investigation, your application of the ASTM and ASCE methodologies and your engineering expertise, what is your professional opinion regarding the proximate cause of the damages to this property?

A. Yes. Based on the weather data, the size of hail reported on that date, and the photographs taken, the eyewitness testimony of the -- the roof leaking after the date of loss, the damages on the

30 (Pages 114 - 117)